**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

JOHN L. MECOM, III, TRUSTEE OF THE       )
KATHLEEN B. MULLENDORE TRUST,            )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )          Case No. 21-CV-00258-GKF-CDL
                                         )
HUNTER MORRIS,                           )
                                         )
            Defendant.                   )

**OPINION AND ORDER**

This matter comes before the court on the Motion for Summary Judgment [Doc. 23] of plaintiff John L. Mecom, III, Trustee of the Kathleen B. Mullendore Trust and the Motion for Partial Summary Judgment [Doc. 43] of defendant Hunter Morris. For the reasons set forth below, the Trust's motion for summary judgment is denied. Morris's motion for partial summary judgment is granted in part and denied in part.

### I.      Background and Procedural History

This is an interpleader action to determine entitlement to a $500,000.00 earnest money deposit made with Musselman Abstract Company related to the sale of 19,200 acres in Osage County and Washington County, Oklahoma (40 acres located in Chautauqua County, Kansas), commonly referred to as the Mullendore Ranch (Ranch). On May 5, 2021, Musselman Abstract Company filed a Petition and Interpleader in the District Court in and for Washington County, State of Oklahoma, as both seller the Kathleen B. Mullendore Trust (the Trust) and buyer Hunter Morris had claimed entitlement to the earnest money and demanded payment of the full sum. [Doc. 2-2]. Morris filed an Answer [Doc. 11], and the Trust filed an Answer [Doc. 6], as well as a Crossclaim for breach of contract [Doc. 7].

Morris filed a motion to dismiss the Trust's Crossclaim, which the court denied. [Doc. 29]. On December 6, 2021, Morris filed a Crossclaim against the Trust that included five counts: (1) fraud; (2) rescission; (3) breach of contract; (4) declaratory judgment determination that Morris was entitled to terminate the Purchase Agreement and to a return of the Earnest Money pursuant to Section 23(A) of the Purchase Agreement; and (5) declaratory judgment determination that Morris is excused from his closing obligations under the Purchase Agreement, and is entitled to a return of the Earnest Money pursuant to Exhibit A of Section 16 to the Purchase Agreement. [Doc. 33, pp. 13-17].

On December 14, 2021, the court dismissed Musselman Abstract Company from the proceedings and realigned the parties to show John L. Mecom, III, Trustee of the Kathleen B. Mullendore Trust as plaintiff and Hunter Morris as defendant. [Doc. 35]. On December 20, 2021, the Court Clerk's Office received an interpleader deposit in the sum of $498,335.86.[1] [Doc. 36].

The Trust filed the Motion for Summary Judgment [Doc. 23] seeking judgment as a matter of law as to its breach of contract claim.[2] [Doc. 23]. Morris responded in opposition [Doc. 24], and the Trust filed a reply [Doc. 28].

On March 16, 2022, Morris filed a motion for partial summary judgment on his claims for declaratory judgment, rescission, and breach of contract. [Doc. 43]. The Trust filed a response in opposition [Doc. 49], and Morris filed a reply [Doc. 50]. Thus, both the Trust's motion for

---

[1] The interpleader deposit represents the $500,000.00 earnest money deposit by Musselman Abstract Company with the Court Clerk of Washington County, State of Oklahoma less a poundage charge of $300.00 and Musselman Abstract Company's litigation expenses, totaling $1,364.14. [Doc. 35].

[2] Although originally denominated as a crossclaim, the Trust's crossclaim is now, upon realignment of the parties, more properly referred to as a claim.

summary judgment and Morris's motion for partial summary judgment are ripe for the court's determination.

## II.      Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998).  A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).  In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

### III.    Undisputed Material Facts

The following material facts are undisputed for purposes of Morris's motion for partial

summary judgment:

On February 10, 2021, Morris and real estate broker John Wildin of Hall and Hall in

Hutchinson, Kansas exchanged emails regarding Morris's potential purchase of another ranch, not

the Mullendore Ranch.   [Doc. 49, p. 8, ¶ 1; Doc. 50, p. 4, ¶ 1; Doc. 49, pp. 24-29].   In an email

time-stamped 12:59 p.m., Wildin stated:

> There is a little known niche in the ranching world that actually does turn the rate
> of return upside down – the Bureau of Land Management wild horse and burro
> sanctuary program.   The short story on this is to compare native grass ranching
> operations between cattle and this program.   In broad terms you can most likely net
> around $25 - $30 per acre leasing a ranch for cattle grazing.   With the BLM
> program, you can net nearly $100 on the same ranch.   You seem astute enough
> about the ranch business that you may be aware of this.   If not call me sometime
> and we can talk about it.

[Doc. 49, p. 8, ¶ 1; Doc. 50, p. 4, ¶ 1; Doc. 49, pp. 25-26].   That same day, at 2:34 p.m., Morris

replied, in part, as follows:

> Interesting that you mention the native horse program – the 3,100 acre ranch I just
> bought was previously under contract and that buyer was planning to run native
> horses.   I am just now beginning to do some research on this program myself, and
> it is extremely interesting to me.   To be candid, if I could acquire good ranches with
> a native horse contract from the government at $100 per acre, I could justify buying
> big ranches all the way up to $3,000 per acre . . . and I could buy a bunch of them.
> I've heard the process takes a couple of years to qualify a ranch for this program,
> and I'd be willing to take that risk if I got comfortable with the mechanics of the
> program.   That being said, I'd be very interested in talking with you about this
> native horse opportunity, and at some point I'd like to contract with a solid attorney
> or consultant that knows how to navigate the legal side and register these properties.

[Doc. 49, pp. 8-9, ¶ 2; Doc. 50, pp. 4-5, ¶ 2; Doc. 49, p. 25].   Wildin replied within minutes, at

2:45 p.m., stating: "As I suspected . . . you do know your way around the ranch world, Hunter!

So we do need to talk whenever you have the time.   I got a horse deal with the horses already in

- 4 -

place and ready to make a sale.  Big ticket - $50M."  [Doc. 49, p. 9, ¶ 3; Doc. 50, p. 5, ¶ 3; Doc. 49, p. 24].

On February 11, 2021, Wildin, as the Trust's broker, emailed Morris to provide an "informal presentation" regarding the Ranch.  [Doc. 43, p. 5, ¶ 1; Doc. 49, p. 2, ¶ 1; Doc. 43-1; Doc. 49, p. 9, ¶ 4; Doc. 50, p. 5, ¶ 4].  The email included the following:

- BLM sanctuary horse program was renewed in January 2020 for a 10-year term for what is referred to as a 2,500 head contract although it actually can max out at around 2,700 head but they like to keep it at the 2,500 number for various reasons.

- They had just come off of 3 consecutive contracts of 5 years each, so this 10 year deal is new and is considered to be more desirable from the BLM perspective.

[Doc. 43, p. 5, ¶¶ 2-3; Doc. 49, p. 2, ¶¶ 2-3; Doc. 43-1].

On February 12, 2021, Sloan Smith of Great Plains Land Company, Morris's broker, emailed Wildin attaching an initial draft of an offer—in the form of an Oklahoma Uniform Contract of Sale of Real Estate Farm, Ranch, and Recreational Land—for purchase of the Ranch. [Doc. 43, pp. 5-6, ¶ 5; Doc. 49, p. 2, ¶ 5; Doc. 43-2; Doc. 43-3, pp. 7-10; Doc. 49, pp. 9-10, ¶ 5; Doc. 50, p. 5, ¶5].  The initial draft included the following:

> **11.   GOVERNMENT PROGRAMS**:   The Property is subject to the government programs listed below or on the attached exhibit: <u>BLM Sanctuary Horse Program renewed in January 2020 with a 10 year term</u>
> Seller shall provide Buyer with copies of all governmental program agreements.  Any allocation or proration of payment under governmental programs is made by separate agreement between the Parties which will survive Closing.

[Doc. 43, p. 6, ¶ 6; Doc. 49, p. 3, ¶ 6; Doc. 43-2, p. 5].  Additionally, Exhibit A to the initial draft stated:

> This Exhibit A, which is attached to and is part of the Oklahoma Uniform Contract of Sale of Real Estate between _____ ("Seller") and <u>Hunter Morris and/or assigns</u> ("Buyer") relating to the following described real estate located in <u>Osage</u>

- 5 -

County & Washington County, County, Oklahoma, at:  (Legal Description or Property Address) 3484 Mullendore Ranch Rd, Copan, OK 74022

Notwithstanding any provision in this Contract to the contrary, it shall be an express condition of the Buyer's closing obligations that Buyer assumes, with the Bureau of Land Management's ("BLM") approval of Buyer, or Buyer's applicable affiliate at closing (as the case may be), the BLM Sanctuary Horse Program Agreement ("BLM Agreement") currently benefitting the Property (which was recently renewed in January of 2020 for a 10 year term), upon (i) the existing terms and conditions of the BLM Agreement, and (ii) terms reasonably acceptable to Buyer upon Buyer's receipt and review of the BLM Agreement.  In addition to Seller's obligations to provide Buyer with a copy of the BLM Agreement as set forth in Section 11 of the Contract, Seller shall provide Buyer copies or access to any written communication from the BLM or other government entities applicable to the BLM Agreement.  Seller further agrees to make commercially reasonable efforts, at no expense to Seller, in cooperating with Buyer and BLM to facilitate the BLM Approval and all documents necessarily required in connection therewith.

[Doc. 43, p. 6, ¶ 7; Doc. 49, p. 3, ¶ 7; Doc. 43-2, p. 9].  Smith informed Wildin, "[t]he contract has not been signed yet.  We wanted to send it over for you to review, and add anything we need to in the contract before finalizing . . . ."  [Doc. 43, p. 6, ¶ 8; Doc. 49, p. 3, ¶ 8; Doc. 43-3, p. 7].

On February 16, 2021, Morris drafted and sent to Wildin an initial offer to purchase the Ranch.  [Doc. 43, p. 7, ¶ 12; Doc. 49, p. 3, ¶ 12; Doc. 43-3, p. 1; Doc. 43-4].  The initial offer also contained the representation that "[t]he Property is subject to the . . . BLM Sanctuary Horse Program renewed in January 2020 with a 10 year term," as well as the Exhibit A set forth above that was included in the February 12 initial draft.  [Doc. 43, p. 7, ¶¶ 13-14; Doc. 49, p. 4, ¶¶ 13-14; Doc. 43-3, p. 1; Doc. 43-4, pp. 5, 9].

The following material facts are undisputed for purposes of both the Trust's summary judgment motion and Morris's motion for partial summary judgment:

On March 4, 2021, Wildin sent Morris and Smith an email to which Wildin attached an addendum, titled Supplement to Oklahoma Uniform Contract of Sale of Real Estate drafted by the Trust's attorney to "cover[] various items that he and John Mecom III felt that needed to be

addressed so that there can be a successful closing of this sale to everyone's benefit."  The Trust

presented the addendum as a "counter offer to [Morris's] original purchase and sale agreement."

[Doc. 43, p. 7, ¶ 15; Doc. 49, p. 4, ¶ 15; Doc. 43-5, pp. 3-4; Doc. 43-6; Doc. 24, p. 10, ¶ 2; Doc.

24-1, pp. 3-4; Doc. 24-2].  Paragraph 8 of the Supplement stated as follows:

> 8.      Section D(4).  This Section shall be modified as follows:
>
> The following leases will be permitted exceptions to the Title Policy and will not
> be a basis for objections to Title:  Oil and gas leases; Supplemental Agreement with
> Enbridge relating to post-construction usage of the Property; unexpired terms of
> two hunting leases; and the Sanctuary Horse Program Agreement with the Bureau
> of Land Management.

[Doc. 43-6, p. 4; Doc. 24-2, p. 4].

On March 5, 2021, Smith forwarded to Wildin a counteroffer from Morris, which included

changes to the proposed purchase price and price per acre, as well as "a request for documents

mentioned in #8 on the addendum."  [Doc. 43, p. 8, ¶ 18; Doc. 49, p. 4, ¶ 18; Doc. 43-5, p. 2; Doc.

43-7; Doc. 24, p. 10, ¶ 5; Doc. 24-1, p. 2; Doc. 24-3].  Morris executed his counteroffer and

initialed all the revisions therein on March 5, 2021.  [Doc. 43, p. 8, ¶ 19; Doc. 49, p. 4, ¶ 19; Doc.

43-7; Doc. 24, p. 10, ¶ 6; Doc. 24-3].

On March 9, 2021, Wildin emailed Morris and Smith, stating:  "Attached is the original

purchase agreement you put forward along with an addendum prepared by the seller's legal counsel

that is directly related to that agreement.  The addendum has been acknowledged and signed by

the seller, John Mecom III as Trustee of the Kathleen Mullendore Trust, agreeing to the sale price."

[Doc. 43, pp. 8-9, ¶¶ 21-22; Doc. 49, p. 5, ¶¶ 21-22; Doc. 43-8; Doc. 43-9; Doc. 24, p. 11, ¶¶ 8-9;

Doc. 24-4; Doc. 24-5].  The email attached the executed the Oklahoma Uniform Contract of Sale

of Real Estate Farm, Ranch, and Recreational Land, including an Exhibit A and Supplemental

Agreement (collectively, "Contract"), for the sale of the Ranch, which identified Kathleen B.

Mullendore Trust, as "Seller," and Hunter Morris, as "Buyer," [Doc. 43, p. 9, ¶ 22; Doc. 49, p. 5, ¶ 22; Doc. 23, p. 2, ¶¶ 1-2; Doc. 24, pp. 2-3, ¶¶ 1-2; Doc. 2-2, pp. 3-18; Doc. 24-5]. The Contract provides:

> The Parties' signatures at the end of the Contract, which includes any attachments or documents incorporated by reference, with delivery to their respective Brokers, if applicable, will create a valid and binding Contract, which sets forth their complete understanding of the terms of the Contract. This agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns. . . . All prior verbal or written negotiations, representations and agreements are superseded by the Contract, which may only be modified or assigned by further written agreement of Buyer and Seller.

[Doc. 23, p. 2, ¶ 3; Doc. 24, p. 3, ¶ 3; Doc. 2-2, p. 3; Doc. 24-5, p. 6]. Pursuant to section 3 of the Contract, the "Time Reference Date" was March 12, 2021. [Doc. 23, p. 4, ¶ 6; Doc. 24, p. 3, ¶ 6; Doc. 2-2, p. 4, § 3; Doc. 24-5, p. 7, § 3].

Section 7 of the Contract, titled "Survey and Title Review," provides, in part, as follows:

> **D.   SURFACE LEASES**. Seller shall provide Buyer with copies of existing written leases and given <u>written notice</u> of oral leases within <u>3</u> days (three [3] days if left blank) of the Time Reference Date. **If there are NO existing Leases this paragraph is not applicable**.
>
> 1) If Seller **does not provide** copies of existing said written leases or give written notice of oral leases within the three (3) days after the Time Reference Date the provisions of Paragraph 20 shall apply. The Seller shall be in default of this Agreement.
>
> 2) This Contract is subject to Buyer review, acceptance and approval of said leases, if any, <u>within five (5) days of the receipt of said leases</u>.
>
> 3) **If the Buyer fails to give notice of objection to the leases, as above, the leases shall be deemed acceptable to the Buyer**.

[Doc. 2-2, pp. 5-6, § 7(D); Doc. 24-5, pp. 8-9, § 7(D)]. The Supplement to Oklahoma Uniform Contract of Sale of Real Estate (Supplement) modifies Section 7(D)(4) as follows:

> 8.   Section D(4). This Section shall be modified as follows:

> The following leases will be permitted exceptions to the Title Policy and will not be a basis for objections to Title:  Oil and gas leases; Supplemental Agreement with Enbridge relating to post-construction usage of the Property; unexpired terms of two hunting leases; and the Sanctuary Horse Program Agreement with the Bureau of Land Management.

[Doc. 2-2, p. 17, ¶ 8; Doc. 24-5, p. 4, ¶ 8].  Additionally, the Supplement provides: "*all documents pertaining to the Supplemental Agreement with Enbridge, unexpired terms of the hunting leases, and the Sanctuary Horse Program to be delivered within 5 business days from mutually executed contract."  [Doc. 2-2, p. 17; Doc. 24-5, p. 4; Doc. 43, p. 9, ¶ 28; Doc. 49, p. 6, ¶ 28].

Section 11 of the Agreement provides:

> **11.    GOVERNMENT PROGRAMS**:    The Property is subject to the government programs listed below or on the attached exhibit:
> <u>BLM Sanctuary Horse Program renewed in January 2020 with a 10 year term</u>.
> Seller shall provide Buyer with copies of all governmental program agreements.  Any allocation or proration of payment under governmental programs is made by separate agreement between the Parties will survive Closing.

[Doc. 2-2, p. 7, § 11; Doc. 24-5, p. 10, § 11; Doc. 43, p. 9, ¶ 23; Doc. 49, p. 5, ¶ 23].

Section 16 of the Contract, titled "Special Provisions," states:  "See attached Exhibit A."

[Doc. 2-2, p. 8, § 16; Doc. 24-5, p. 11, § 16].  The Oklahoma Real Estate Commission Farm, Ranch, and Recreational Land – Exhibit A (Exhibit A) provides as follows:

> This Exhibit A, which is attached to and is part of the Oklahoma Uniform Contract of Sale of Real Estate between _____ ("Seller") and Hunter Morris and/or assigns ("Buyer") relating to the following described real estate located in Osage County & Washington County, County, Oklahoma, at:  (Legal Description or Property Address) 3484 Mullendore Ranch Rd, Copan, OK 74022
>
> Notwithstanding any provision in this Contract to the contrary, it shall be an express condition of the Buyer's closing obligations that Buyer assumes, with the Bureau of Land Management's ("BLM") approval of Buyer, or Buyer's applicable affiliate at closing (as the case may be), the BLM Sanctuary Horse Program Agreement ("BLM Agreement") currently benefitting the Property (which was recently renewed in January of 2020 for a 10 year term), upon (i) the existing terms and conditions of the BLM Agreement, and (ii) terms reasonably acceptable to Buyer

- 9 -

upon Buyer's receipt and review of the BLM Agreement.  In addition to Seller's obligations to provide Buyer with a copy of the BLM Agreement as set forth in Section 11 of the Contract, Seller shall provide Buyer copies or access to any written communication from the BLM or other government entities applicable to the BLM Agreement.  Seller further agrees to make commercially reasonable efforts, at no expense to Seller, in cooperating with Buyer and BLM to facilitate the BLM Approval and all documents necessarily required in connection therewith.

[Doc. 2-2, p. 11; Doc. 24-5, p. 14; Doc. 43, p. 9, ¶¶ 24, 27; Doc. 49, pp. 5-6, ¶¶ 24, 27].  Finally,

Section 23 of the Contract states:

23.    **REPRESENTATIONS**

A.    Seller represents that as of the Closing Date:  (a) there will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds unless securing payment of any loans assumed by Buyer, and (b) assumed loans will not be in default.  If any representation of Seller in this Contract is untrue on the Closing Date, Buyer may terminate this Contract and the Earnest Money will be refunded to Buyer.

B.    Buyer represents that they have **NOT** relied on any quoted acreage and/or square footage from any source and have had the right to measure the land or buildings on the Property to their satisfaction prior to closing.

[Doc. 2-2, p. 9, § 23; Doc. 24-5, p. 12, § 23; Doc. 43, p. 9, ¶ 26; Doc. 49, p. 5, ¶ 26].

Per the terms of the Contract, Morris deposited with Musselman Abstract Company, the escrow agent, the sum of $500,000.00 on March 12, 2021.  [Doc. 23, p. 3, ¶ 5; Doc. 24, p. 4, ¶ 5].  On March 17, 2021, counsel for the Trust delivered to Morris contract documents relating to the BLM Sanctuary Horse Program (BLM Agreement).  [Doc. 23, p. 3, ¶ 8; Doc. 24, p. 4, ¶ 8; Doc. 23, pp. 35-38; Doc. 43, p. 10, ¶ 29; Doc. 49, p. 6, ¶ 29].

The BLM Agreement includes a base period of performance from January 1, 2020 through December 31, 2020.  The base period is followed by nine separate, year-long option periods from January 1, 2021 to December 31, 2029.  [Doc. 43, p. 10, ¶ 31; Doc. 49, p. 6, ¶ 31; Doc. 24, pp. 11, ¶ 14; Doc. 25, pp. 2-4].  The BLM Agreement incorporates by reference Federal Acquisition

Regulation contract clause 52.217-5, "Evaluation of Options," and contract clause 52.217-9, "Option to Extend the Term of the Contract." [Doc. 25, p. 17].  Further, the BLM Agreement incorporates by reference the clause at 52.202-1, "Definitions." [*Id.* at p. 21].  Finally, the BLM Agreement includes subparagraph (*l*), "Termination for the Government's convenience," which states:

> The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience.  In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work.  Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.  The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose.  This paragraph does not give the Government any right to audit the Contractor's records.  The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

[Doc. 43, p. 10, ¶ 32; Doc. 49, p. 6, ¶ 32; Doc. 25, pp. 24-25].

> In correspondence to the Trust's counsel dated April 20, 2021, counsel for Morris stated:

> As counsel for Buyer, we request Seller's execution of the attached proposed First Amendment to the Contract for purposes of amending certain terms set forth therein.  Furthermore, this letter is to advise Seller that if Buyer does not receive delivery of a Seller-executed counterpart of this amendment before 5:00 pm central time on April 23, 2021 this letter constitutes Buyer's notice of its termination of the Contract pursuant to Section 9 of the Contact, and escrow agent is thereby instructed to return the amount of $500,000.00 to Buyer in accordance with the Contract.

[Doc. 23, p. 4, ¶ 11; Doc. 24, p. 6, ¶ 11; Doc. 23, pp. 39-42; Doc. 43, pp. 10-11, ¶ 34; Doc. 49, p. 7, ¶ 34; Doc. 43-12; Doc. 43-13].  On April 22, 2021, counsel for the Trust responded, stating in part:

> I hereby acknowledge receipt of your letter of April 20, 2021 by which you seek, as counsel for Hunter Morris, to renegotiate the terms of the March 5, 2021 Contract and give notice of Mr. Morris' termination of the Contract in the event the proposed

First Amendment to the Contract is not executed and returned to Mr. Morris.  You are advised that my client (as "Seller") contends that Mr. Morris (as "Buyer") has no right to terminate the Contract.  Furthermore, you are advised that the Seller has no intention of renegotiating the terms of Contract.  You are also advised that the Buyer's stated intention to terminate the Contract effective at 5:00pm on April 23, 2021 will, unless withdrawn before 5:00pm tomorrow, constitute a default by the Buyer and that the Seller will proceed to exercise its default remedies pursuant to Section 20 of the Contract.  Please advise me prior to 5:00pm Central Time on April 23, 2021 if the Buyer intends to withdraw its notice of termination; otherwise, the Seller will consider the Buyer to be in default as of 5:01pm on April 23, 2021 and will proceed accordingly.

[Doc. 23, p. 4, ¶ 12; Doc. 24, pp. 6-7, ¶ 12; Doc. 23, pp. 43-44; Doc. 49, p. 12, ¶ 12; Doc. 50, p. 6, ¶ 12].  On April 23, 2021, counsel for Morris responded by letter to the Trust's counsel, stating, in part:

Lastly, and as a separate issue from that discussed above, is the appraisal issue faced due to the BLM Agreement (as defined in the Contract), containing language which allows the Bureau of Land Management ("Government") to terminate the BLM Agreement for the Government's convenience.  Buyer entered into the Contract based on representations that the BLM Agreement was ten (10) year agreement, as would be reasonably interpreted in reliance of such.  However, upon receipt and review of the BLM Agreement, such termination rights granted to the Government allows the BLM Agreement to essentially operate on a month-to-month basis, resulting in appraisals of the Property to come in at valuations below the purchase price (values consistent with our recently proposed amendment).  As such, please note that pursuant to Section 16 of the Contract, and as set forth on the referenced Exhibit "A" thereto, it is "an express condition of Buyer's closing obligations that Buyer assumes, with the [Government's] approval of Buyer, or Buyer's applicable affiliate at closing, the BLM Agreement . . . upon (i) the existing terms and conditions of the BLM Agreement, and **(ii) terms reasonably acceptable to Buyer upon Buyer's receipt and review of the BLM Agreement** (emphasis added).  The existence of a provision allowing the Government a right to terminate for convenience undoubtedly calls into question the reasonableness of the BLM Agreement terms upon Buyer's review, and is a position that is strengthened when considering (i) Buyer's reliance on what it assumed was a standard ten (10) year contractual term, and (ii) Buyer's receipt of multiple new appraisals discounting the valuation of the Property due to the nature of the Government's termination right. . . .

Please allow this letter to serve as Buyer's termination of the Contract effective as of the date hereof, and receive a return of its Earnest Money.

[Doc. 24, p. 13, ¶ 24; Doc. 24-12; Doc. 43, pp. 11-12, ¶¶ 36-37; Doc. 49, p. 8, ¶¶ 36-37].

Both Morris and the Trust claim entitlement to the earnest money now on deposit with the Court Clerk.

## IV.    Analysis of Morris's Motion for Partial Summary Judgment

For ease of analysis, the court first considers Morris's motion for partial summary judgment. As previously stated, Morris seeks judgment as a matter of law as to his claims for declaratory judgment, recission, and breach of contract. The court first turns to Morris's request for declaratory judgment.

### A.    *Declaratory Judgment*

Morris seeks a declaration that both Section 23(A) and Exhibit A of the Contract permitted Morris to terminate the Contract once he determined that the terms of the BLM Agreement were not as they had been represented to him and that they were not acceptable.

Looking first to Section 23(A) of the Contract, that section states, in relevant part, "[i]f any representation of Seller in this Contract is untrue on the Closing Date, Buyer may terminate this Contract and the Earnest Money will be refunded to Buyer." [Doc. 2-2, p. 9, § 23; Doc. 24-5, p. 12, § 23; Doc. 43, p. 9, ¶ 26; Doc. 49, p. 5, ¶ 26]. Morris argues that the Trust's representation that the BLM Agreement was "renewed in January 2020 for a 10 year term" was demonstrably false as the BLM Agreement does not have a ten-year term but, instead, includes a base period of performance from January 1, 2020 through December 31, 2020, then nine one-year option periods.

As previously stated, it is undisputed that BLM Agreement includes a base period of performance from January 1, 2020 through December 31, 2020. The base period is followed by nine separate, year-long option periods from January 1, 2021 to December 31, 2029. [Doc. 43, p. 10, ¶ 31; Doc. 49, p. 6, ¶ 31; Doc. 25, pp. 2-4]. Further, the BLM Agreement incorporates by reference Federal Acquisition Regulation contract clause 52.217-5, "Evaluation of Options,"

- 13 -

contract clause 52.217-9, "Option to Extend the Term of the Contract," and the clause at 52.202-1, "Definitions." [Doc. 25 at pp. 17, 21].

Section 52.202-1 provides that "[w]hen a . . . contract clause uses a word or term that is defined in the Federal Acquisition Regulation (FAR), the word or term has the same meaning as the definition in FAR 2.101." FAR § 52.202-1. FAR § 2.101 defines "option" as "a *unilateral right* in a contract by which, for a specified time, the Government may elect to purchase additional supplies or services called for by the contract, or may elect to extend the term of the contract." FAR § 52.202-1 (emphasis added). It is well-established "where a contract is renewable solely at the option of the government, the government is under no obligation to exercise the option." *Mktg. & Mgmt. Info., Inc. v. United States*, 62 Fed. Cl. 126, 130 (Fed. Cl. 2004); *see also Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1380 (Fed. Cir. 2004) (quoting *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed. Cir. 1988)) ("[W]here a contract is renewable 'at the option of the Government,' the government is under no obligation to exercise the option[.]"). The plain language of the BLM Agreement imparts a unilateral right to the government to exercise its option to extend the Contract on a year-to-year basis. That is, the Agreement imposes no obligation on the government to continue the wild horse arrangement into the next option period.[3]

Under Oklahoma law, "[a]n option so long as it remains unaccepted, is a unilateral writing lacking the mutual elements of a contract, but when it is accepted by the optionee an executory contract arises, mutually binding upon the parties." *Crane-Rankin Dev. Co. v. Duke*, 90 P.2d 883,

---

[3] Further, the BLM Agreement includes a termination for convenience provision pursuant to which the government reserved its right to terminate the Agreement "for its sole convenience." [Doc. 25, p. 24]. "[I]t is well-settled that a termination for convenience does not breach the contract." *Fields v. United States*, 53 Fed. Cl. 412, 417 (Fed. Cl. 2002). Thus, the government could cancel the BLM Agreement at any time and incur no liability toward the Trust and/or Morris.

884 (Okla. 1939); *see also Davenport v. Doyle Petroleum Corp.*, 126 P.2d 57, 61 (Okla. 1942); *Bobo v. Bigbee*, 548 P.2d 224, 229 (Okla. 1976) (collecting cases). Thus, until accepted by the government, no contract exists as a matter of law for the remaining option periods. Accordingly, the statement that the BLM Agreement was recently renewed in January of 2020 **for a ten year term** is untrue under Oklahoma law.

The Trust argues that termination under Section 23(A) is not permitted as Morris, not the Trust, placed the statement regarding the ten-year BLM Agreement in the Contract and therefore the statement was not a "representation of Seller." [Doc. 49, pp. 15-16]. However, the Trust signed the Contract. [Doc. 43, pp. 8-9, ¶¶ 21-22; Doc. 49, p. 5, ¶¶ 21-22; Doc. 43-8; Doc. 43-9; Doc. 24, p. 11, ¶¶ 8-9; Doc. 24-4; Doc. 24-5]. It is fundamental that one who signs the contract is bound by the terms thereof. *See Mayfield v. Fid. St. Bank of Cleveland,* 249 P. 136, 136 (Okla. 1926); *Franco v. State ex el. Bd. of Regents of the Univ. of Okla.*, 482 P.3d 1, 9 (Okla. Civ. App. 2020); *see also Allis Chalmers Mfg. Co. v. Byers*, 88 P.2d 368, 371 (Okla. 1939) (internal citations omitted) ("[I]t is generally presumed that one who executes such an instrument has read it and understands its contents. . . . It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written."); 27 WILLISTON ON CONTRACTS § 70:114 (4th ed. Nov. 2021 update) ("One who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them."). The Trust cannot now disclaim the statement having adopted it by its signature. And though Morris's broker placed the statement regarding the ten-year BLM Agreement in the Contract, the Contract

was signed before Morris and his broker were given the opportunity to review the terms of that Agreement.

Finally, the Trust argues that Morris cannot establish a *fraudulent* misrepresentation for various reasons. However, Subsection 23(A) does not require that the seller's representation be fraudulent. Rather, the section applies when the representation is *untrue*. For the reasons discussed above, the representation that the BLM Agreement was recently renewed "for a 10 year term" is untrue as a matter of law. Thus, the presence or absence of fraud is not dispositive.[4]

Because the representation that the BLM Agreement was renewed in January of 2020 for a ten-year term was untrue, Morris was permitted to terminate the Contract pursuant to Section 23A thereof and is entitled to refund of the earnest money. Morris is entitled to a declaratory judgment of same.[5]

Morris next seeks a declaration that he was permitted to terminate the Contract pursuant to Exhibit A. As previously stated, Exhibit A to the Contract provides:

> ***Notwithstanding any provision in this Contract to the contrary,*** it shall be an express condition of the Buyer's closing obligations that Buyer assumes, with the Bureau of Land Management's ("BLM") approval of Buyer, or Buyer's applicable affiliate at closing (as the case may be), the BLM Sanctuary Horse Program Agreement ("BLM Agreement") currently benefitting the Property (which was

---

[4] The Trust also raises the following arguments: (1) misrepresentations of law do not support a claim for fraudulent misrepresentation, and (2) Morris is a sophisticated buyer who had the ability to ascertain the truth about the BLM Agreement but failed to exercise due diligence. [Doc. 49, pp. 16-17]. These arguments are rooted in Oklahoma law rather than the language of the Contract and therefore are best considered in the court's discussion of rescission.

[5] Additionally, it is undisputed that the Trust did not provide a copy of the BLM Agreement to Morris until March 17, 2021—six business days after execution of the Contract. [Doc. 23, p. 3, ¶ 8; Doc. 24, p. 4, ¶ 8; Doc. 23, pp. 35-38; Doc. 43, p. 10, ¶ 29; Doc. 49, p. 6, ¶ 29]. But the Contract required the Trust to provide Morris the BLM Agreement within five business days of execution. [Doc. 2-2, p. 17; Doc. 24-5, p. 4; Doc. 43, p. 9, ¶ 28; Doc. 49, p. 6, ¶ 28]. Thus, the Trust did not timely provide the BLM Agreement and therefore technically breached the Contract. Though Morris points out the technical breach, he does not rely on it in seeking partial summary judgment.

recently renewed in January of 2020 for a 10 year term), upon (i) the existing terms and conditions of the BLM Agreement, and (ii) ***terms reasonably acceptable to Buyer upon Buyer's receipt and review of the BLM Agreement***.  In addition to Seller's obligations to provide Buyer with a copy of the BLM Agreement as set forth in Section 11 of the Contract, Seller shall provide Buyer copies or access to any written communication from the BLM or other government entities applicable to the BLM Agreement.  Seller further agrees to make commercially reasonable efforts, at no expense to Seller, in cooperating with Buyer and BLM to facilitate the BLM Approval and all documents necessarily required in connection therewith.

[Doc. 2-2, p. 11 (emphasis added); Doc. 24-5, p. 14; Doc. 43, p. 9, ¶¶ 24, 27; Doc. 49, pp. 5-6, ¶¶ 24, 27]. Thus, Exhibit A makes it an explicit condition of the Contract that Morris assume the BLM Agreement upon "terms reasonably acceptable to Buyer upon Buyer's receipt and review of the BLM Agreement."

In opposition, the Trust argues that Section 7(D) of the Contract required Morris to notify it of any objections to the BLM Agreement within five days of receipt.  Morris did not do so and the Trust contends the BLM Agreement was therefore deemed acceptable to Morris pursuant to Section 7(D)(3).

Section 7(D) of the Contract required the Trust to provide Morris "copies of existing written leases and give written notice of oral leases within 3 days . . . of the Time Reference Date." [Doc. 2-2, p. 5, § 7(D); Doc. 24-5, p. 8, § 7(D) (emphasis altered from original)].  It is undisputed that, pursuant to subsection 7(D)(2), the Contract "[was] subject to Buyer review, acceptance and approval of said leases, if any, within five (5) days of the receipt of said leases."  [Doc. 2-2, p. 6, § 7(D)(2); Doc. 24-5, p. 9, § 7(D)(2) (emphasis altered from original)].  Section 7(D)(3) then provides that "[i]f the Buyer fails to give notice of objection to the leases, as above, the leases shall be deemed acceptable to the Buyer."  [Doc. 2-2, p. 6, § 7(D)(3); Doc. 24-5, p. 9, § 7(D)(3)].

However, Exhibit A is specific to Morris's receipt, review, and approval of the BLM Agreement.  It includes no provision through which the BLM Agreement "shall be deemed

acceptable to [Morris]."  Nor does Exhibit A reference Section 7(D).  Moreover, the provisions of Exhibit A explicitly apply "[n]otwithstanding any provision in th[e] Contract to the contrary." [*Id.*].  "[W]here an agreement contains both general and specific paragraphs, differently defining rights of the parties, a provision within a specific paragraph is controlled by it, though it is also embraced in the general provision."  *Occidental Life Ins. Co. of Cal. v. Marmaduke Corbyn Agency*, 187 F.2d 553, 555 (10th Cir. 1951) (applying Oklahoma law).  Exhibit A requires Morris's acceptance of the BLM Agreement, but provides no timeframes for such approval or by which the Agreement may be "deemed acceptable."  As the provision specific to Morris's review and approval of the BLM Agreement, Exhibit A controls.

Further, Section 7(D)(2) and Section 7(D)(3) apply to "leases."  The Contract does not define "lease."  But

> [a]ll contracts are formed to be construed in the light of the rules and principles of law applicable to the subject-matter of the transaction, and those rules and principles control the rights of the parties; the laws upon the subject of a contract are read into it and become a part thereof to the same extent as though they were written into its terms.

*Baker v. Tulsa Bldg. & Loan Ass'n*, 66 P.2d 45, 50 (Okla. 1936); *see also* Okla. Stat. tit. 15, § 161 ("Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.").  Under Oklahoma law, "[a] 'lease is a contract between the lessor and lessee . . . [that] becomes a grant of an *estate in real property* when it takes effect in possession.'"  *Material Serv. Corp. v. Town of Fitzhugh*, 343 P.3d 624, 630 (Okla. Civ. App. 2014) (internal quotation omitted; emphasis added) (quoting *Ferguson v. Dist. Ct. of Okla. Cnty.*, 544 P.2d 498, 499 (Okla. 1975)).  "During a lease, 'the lessee holds an outstanding leasehold in the premises *which for all practical purposes is equivalent to absolute ownership*.'"  *Material Serv. Corp.*, 343 P.3d at 630 (quoting *Ferguson,* 544 P.2d at 499).  Based

on the court's review, the BLM Agreement does not provide to the government rights "which for all practical purposes are equivalent to absolute ownership."   Unlike a traditional grazing lease agreement, which grants the lessee the right to occupy and use for a specific purpose certain real property, the BLM Agreement is couched in terms of a service contract—specifically, the provision of services to care, handle, and provide humane treatment for wild horses.  [Doc. 25, p. 6].  To that end, the BLM Agreement is titled and characterized as a "Statement of Work," not as a lease, and provides prices/costs for "supplies" and "services."  [Doc. 25, pp. 1-3].  Thus, despite the reference in paragraph 8 of the Supplement to the BLM Agreement as a "lease," the BLM Agreement does not constitute a "lease" as a matter of Oklahoma law.

Exhibit A made an express condition of Morris's closing obligations that he assume the BLM Agreement upon "terms reasonably acceptable to [him] upon [his] receipt and review of the BLM Agreement."  [Doc. 2-2, p. 11; Doc. 24-5, p. 14; Doc. 43, p. 9, ¶¶ 24, 27; Doc. 49, pp. 5-6, ¶¶ 24, 27].  Morris submits undisputed evidence that a one-year base period followed by nine yearly option periods, as well as the "termination for the Government's convenience" provision, were not reasonably acceptable to him.  *See* [Doc. 24-12, p. 2; Doc. 43-11, p. 1, ¶¶ 4-5; Doc. 43-15, p. 2].  Because the terms of the BLM Agreement were unacceptable to Morris, Exhibit A to the Contract permitted him to terminate the Contract and Morris is entitled to a declaratory judgment as to same.

B.    Rescission

In the alternative, Morris seeks a declaration that the Agreement is rescinded and void *ab initio*.  It is fundamental that "[i]n order to have a valid contract there must be mutual consent, or a meeting of the minds."  *Beck v. Reynolds,* 903 P.2d 317, 319 (Okla. 1995) (citing Okla. Stat. tit. 15, §§ 2, 66).  "The consent of the parties must be mutual, and consent is not mutual unless the

parties all agree upon the same thing in the same [sense]." *Beck*, 903 P.2d at 319; *see also Hampton v. Sur. Dev. Corp.*, 817 P.2d 1273, 1274 (Okla. 1991) ("When there is a mutual mistake of fact as to a material element of the contract, a meeting of the minds is absent."); *Watkins v. Grady Cnty. Soil & Water Conservation Dist.*, 438 P.2d 491, 494-95 (Okla. 1968). "When a contract is executed under a mutual mistake of fact, a court can rescind the contract and restore the parties to the same positions as when the contract was executed." *Hampton*, 817 P.2d at 1274-75; *see also Beck*, 903 P.2d at 319 ("Section 233 of title 15 provides that a party may rescind a contract when consent was given by mistake. Rescission, not reformation, is the proper remedy when an apparent contract is made because of mutual mistake of fact even when the contract has been executed.").

The Oklahoma Supreme Court's decision in *Beck* is instructive. There, the parties agreed to settle a lawsuit for $201,000.00 under the mistaken belief that the applicable insurance policy limits were $100,000.00 when the limits were, in fact, $1,000,000. The settlement agreement was based on the mistaken belief as to the policy's coverage limits. *Beck,* 903 P.2d at 319. The court concluded that there was no meeting of the minds as "the parties did not 'agree upon the same thing in the same sense.'" *Id.* Thus, rescission was appropriate. *Id.*

Similarly, in *Hampton*, the Oklahoma Supreme Court affirmed a trial court's decision to rescind a contract for the sale and purchase of real estate where the selling price was based on square footage and the contract was made contingent on rezoning by Oklahoma City. *Hampton,* 817 P.2d at 1274. The parties believed that the City required a seventeen foot easement as a condition to rezoning and therefore reduced the selling price by nearly $14,000. The plaintiff seller executed the deed conveying the property to the defendants, then the easement was conveyed to the City. However, the City deeded the easement back to the plaintiff, noting "[t]he purpose of this quit claim deed is to remove a cloud on the title to the above-described property created by

the invalid and void easement . . . ."  *Id.*  The court concluded a mutual mistake of fact existed as to a material element of the contract, and there was no meeting of the minds.  *Id.*

Morris submits undisputed evidence that he did not learn until after execution of the Contract that the BLM Agreement that it had one base-year with nine one-year options, rather than a ten-year term.  [Doc. 43-11].  Further, the Trust has submitted evidence that it understood the BLM Agreement to be a ten-year agreement.  [Doc. 49, p. 22].  Morris submits evidence that the term of the BLM Agreement was material to him.  *See* [Doc. 43-11; Doc. 49, pp. 8-9, ¶ 2; Doc. 50, pp. 4-5, ¶ 2; Doc. 49, p. 25].  Like the mistake as to the applicable insurance policy limit in *Beck* and the requirement for an easement in *Hampton*, the undisputed facts demonstrate that, here, a mutual mistake of fact existed as to a material term of the BLM Agreement.  That is, the parties did not agree upon the term of the BLM Agreement in the same sense, there was no meeting of the minds, and rescission is appropriate.  *See Hampton*, 817 P.2d at 1274-75; *see also Beck*, 903 P.2d at 319.

The Trust contends that any misunderstanding as to the terms of the BLM Agreement constitutes a mistake of law, which cannot support a claim for fraudulent misrepresentation. However, as discussed above, the mistake is best characterized as one of fact which prevented a meeting of the minds—the court has not granted rescission based upon fraudulent misrepresentation.[6]  Further, even if the mistake was one of law, Oklahoma courts have

---

[6] Oklahoma statutes define a mistake of fact as "a mistake not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in . . . [b]elief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed."  Okla. Stat. tit. 15, § 63(2).  In contrast, a mistake of law arises only from "[a] misapprehension of the law by all parties, all supposing that they knew and understood it, and all making substantially the same mistake as to the law," or "[a] misapprehension of the law by one party, of which the others are aware at the time of contracting, but which they do not rectify." Okla. Stat. tit. 15, § 64.

consistently held "equity will grant relief where parties have made a mistake as to the legal meaning and operation of the terms of language employed in a writing." *Crockett v. McKenzie*, 867 P.2d 463, 468 (Okla. 1994).  Thus, "if parties who mutually agree on the terms of a contract choose and use legal phrases and terms in the contract, which, in legal effect, express a different meaning from that agreed upon, a court of equity will reform or cancel the contract according to the equities of the case." *Bagby v. Martin*, 247 P. 404, 406 (Okla. 1926).  Accordingly, because the parties did not appreciate the legal effect of the phrase "10 year term," equity warrants rescission.

Finally, insofar as the Trust asserts that rescission is inappropriate because Morris had the ability to ascertain the truth, but failed to do so, the court is not persuaded.  First, Oklahoma courts have declined to preclude a party from seeking a remedy "because of the fact that he had an opportunity to investigate them and did not do so." *Greene v. Humphrey*, 274 P.2d 535, 537 (Okla. 1954).  Further, it is undisputed that the Trust did not provide Morris a copy of the BLM Agreement until after execution of the Contract.  [Doc. 23, p. 3, ¶ 8; Doc. 24, p. 4, ¶ 8; Doc. 23, pp. 35-38; Doc. 43, p. 10, ¶ 29; Doc. 49, p. 6, ¶ 29].  Although the Trust speculates that Morris could "easily have discovered how the contracts are structured through easily accessible online websites like the Bureau of Land Management, or the Federal Acquisition Regulation, among others" [Doc. 49, p. 17], the Trust offers no evidence to substantiate its claim.[7]  And despite the Trust characterizing Morris as "highly sophisticated in acquisitions of ranch property [with] prior experience and interest in the government's wild horse program contracts," the undisputed evidence indicates that

_____

[7] In fact, the court has attempted to access similar contacts on public websites and was unable to do so.

Morris "was just beginning to do some research on [the ] program."  [Doc. 49, pp. 8-9, ¶ 2; Doc. 50, pp. 4-5, ¶ 2; Doc. 49, p. 25].  Finally, Oklahoma law requires only that a party seek to rescind promptly upon discovering facts that entitle him to rescind.  *See Burke v. Donnermeyer*, 448 P.2d 446, 450 (Okla. 1968); Okla. Stat. tit. 15, § 235.  Thus, for all of these reasons, Morris is not precluded from seeking rescission by his asserted failure to ascertain the truth.

For the reasons discussed above, the court hereby rescinds the Contract and Morris is entitled to summary judgment on this alternative ground.  "[O]n rescission of a contract, it is avoided *ab initio*, and the rights of the parties in reference to the subject matter of it are the same as if no contract had ever been made."  *Berland's Inc. of Tulsa v. Northside Village Shopping Ctr., Inc.*, 447 P.2d 768, 772 (Okla. 1968).  Thus, Morris is entitled to return of the escrow deposit.

C.    *Breach of Contract*

Morris also seeks summary judgment as to his breach of contract claim.  Under Oklahoma law, the elements of a breach of contract claim are: "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach."  *Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018).  Because the court has rescinded the Contract, it is as if no contract existed.  Thus, Morris cannot establish the necessary elements of a breach of contract claim and Morris's motion for summary judgment as to the breach of contract claim must be denied.  *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (citation omitted; emphasis altered from original)) ("[W]here the moving party has the burden [of proof]—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.").

## V.      Analysis of the Trust's Motion for Summary Judgment

In the motion, the Trust explains its breach of contract theory as follows:  Section 7(D) of the Contract required Morris to notify the Trust of any objections to the BLM Agreement within five days of receipt.  Morris did not do so and therefore the BLM Agreement was deemed acceptable to Morris pursuant to Section 7(D)(3).  Thus, Morris's subsequent efforts to renegotiate the Contract, and his eventual termination of the Contract, based on the BLM Agreement constitute a material breach.  The Trust contends it is therefore entitled to recover the $500,000.00 earnest money deposit as liquidated damages.  [Doc. 23, pp. 13-14].  Based on the court's review of the briefing, whether or not Section 7(D) applies to the BLM Agreement is dispositive as to the Trust's motion for summary judgment.[8]   As discussed above, Sections 7(D)(2) and 7(D)(3) are inapplicable to the BLM Agreement.  Specifically, Exhibit A, as the more specific provision, controls.  Further, the BLM Agreement is not a lease.  Thus, the BLM Agreement was not "deemed acceptable" and Section 7(D) did not prohibit the BLM Agreement from serving as the basis for Morris's attempt to renegotiate and/or terminate the Contract.  The Trust directs the court to no other Contract provision that Morris allegedly violated in attempting to renegotiate the Contract.  Accordingly, the Trust has failed to establish that no genuine dispute of material fact exists as to whether Morris violated the Contract and the Trust's motion for summary judgment must be denied.  *See Leone,* 810 F.3d at 1153.

---

[8] The parties agree that "the Contract terms are free of ambiguity or uncertainty" and therefore the court may interpret its terms as a matter of law, without resort to extrinsic evidence.  [Doc. 28, p. 1; Doc. 24, pp. 16-17]; *see also Pitco Prod. Co. v. Chaparral Energy, Inc*., 63 P.3d 541, 545 (Okla. 2003) ("If language of a contract is clear and free of ambiguity the court is to interpret it as a matter of law, giving effect to the mutual intent of the parties at the time of contracting.").

### VI.    Conclusion

WHEREFORE, the Motion for Partial Summary Judgment [Doc. 43] of defendant Hunter Morris is denied as to Morris's breach of contract claim.  The motion is otherwise granted.

The Motion for Summary Judgment [Doc. 23] of plaintiff John L. Mecom, III, Trustee of the Kathleen B. Mullendore Trust is denied.

DATED this 2nd day of May, 2022.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE